## PETRIFIED BONE MIN. CO. et al. v. ROGERS et al.

(Circuit Court, E. D. Pennsylvania. January 26, 1907.)

### No. 39.

1. SALE—BREACH OF WARRANTY—EVIDENCE OF DAMAGES.

> Where phosphate rock, furnished by plaintiffs to defendant to be shipped by defendant to a customer upon a contract, did not comply with plaintiff's warranty as to quality, and for that reason defendant's customer refused to accept it under the contract, but purchased it at a reduced price, such price, while not conclusive, is some evidence of the market

value, and is admissible on the question of damages sustained by defendant by the breach of warranty.

2. SAME—MEASURE OF DAMAGES.

Where plaintiff, which sold phosphate rock to defendants for shipment and delivery to a customer of defendants in Italy under a contract, warranted that the rock should meet the requiremetns of such contract as to quality, but by reason of its failure to do so the customer refused to receive it, the measure of damages for the breach of the warranty is the difference between the market value in the Italian port of delivery of rock of the quality called for and the market value of the inferior quality shipped.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1287.]

3. NEW TRIAL—GROUNDS—VERDICT AGAINST EVIDENCE.

The verdict of a jury in an action to recover the price of a commodity sold, in which defendant pleaded a set-off for breach of warranty, *held* sustained by the evidence, and not contrary to the instructions on a motion for a new trial.

At Law. On motion for new trial.

James Collins Jones, for plaintiff.

John Scott, Jr., for defendants.

HOLLAND, District Judge. This is a suit in assumpsit for the sale of phosphate rock to the defendants, and judgment was recovered by the plaintiffs. Reasons for a new trial were filed, urging that the verdict was against the law, the evidence, and charge of the court. It was very ably argued by counsel for the defendants, but we are unable to agree with him. The following is the charge:

"Gentlemen of the Jury: In this case the plaintiff companies, being three in number, have brought suit against Rogers, Holloway & Co. to recover the sum of $4,708.42, with interest on $2.384.93 from September 30, 1902, and on $2,323.49 from October 18, 1902. This sum total is made up of a balance due on two shipments of phosphate rock made by the plaintiffs to the defendants, which the defendants delivered to a customer in Italy. One of the shipments was made on a contract of October 24, 1901, and on this there is a balance due of $2,384.93, with interest from September 30, 1902. The other shipment was on a contract made October 7, 1902, upon which there was part payment, leaving a balance due on that shipment of $2,323.49, with interest from October 18, 1902, making the total stated.

"The defense to this claim is this: That upon the shipment made by the plaintiff companies on the contract of October 24, 1901, upon which the plaintiff shipped 2,725.66 tons of this phosphate rock from Mt. Pleasant, Tenn., to Italy, there was a guaranty that this phosphate rock should contain a certain amount of phosphate—78 units of phosphate, and not more than 4 units of certain impurities. When it was shipped, and before it arrived, but while in transit, there was an analysis made of samples taken from it, and it was discovered that it was not up to the requirements. Upon its arrival the consignee, Marinoni, refused to accept it upon the contract made by him with the defendants for its purchase, because of the fact that it was not up to the requirements. As a result of this the defendants claim they were damaged to the amount of $12,756.08, which amount they say they have a right to set off against the claim which the plaintiffs' have against them, and to ask at your hands a certificate in their favor for the balance of this damage which they claim to have suffered.

"It appears from the evidence in the case that the defendants did enter into a contract with the plaintiffs upon the 24th day of October, 1901, for 6,000 tons of phosphate rock, which was to be of a certain quality; that is, it was to contain 78 units of phosphate, and 3 and 2, as they put it, not more, however, than 4, units of these impurities, and 2 units of water. It also appears

from the evidence that this phosphate rock was purchased by the defendants for shipment abroad. The plaintiffs knew that, and they knew what standard of material they were to ship abroad. They had contracted to deliver to the defendants a certain quality of material, to wit, 78 per cent. of phosphate, and 3 and not over 4 of other impurities, and 2 of water. It is undisputed that, in violation of that agreement, they did deliver to the defendants an inferior article, which contained impurities in excess of 4 units, and that material of an inferior quality was shipped to the defendants and delivered to their consignee in Italy. It appears that this phosphate rock was loaded on board the cars in Mt. Pleasant, Tenn., and shipped by rail to Pensacola, and from Pensacola upon a boat to Venice, Italy. There it was delivered under a contract by the defendants to Marinoni for a certain price, to wit, eight pence per unit of phosphate in the material. Marinoni, before he accepted or settled entirely with the defendants, discovered that this phosphate rock was not up to the guaranty or requirements, in that it contained more than 4 units of these impurities, which, it is said by the witnesses, destroyed its usefulness as phosphate rock, because it will not dissolve, and because it is not as valuable as a fertilizer as it would be if it contained less than 4 units of these impurities.

"The defendants say that by reason of the fact that this material was of an inferior quality they were damaged to the amount I have stated. When the plaintiffs undertook and contracted with the defendants to deliver them a phosphate rock of a certain quality, which they knew was to be shipped abroad to Venice to a customer of the defendants, they were bound to ship them the quality of rock called for in the contract, or to stand the consequences of a violation; and when they shipped to the defendants an article of an inferior quality to that called for in the contract, they, of course, were responsible for any damage that would result to the defendants. Under the law the measure of damages of the defendants is the difference between the market value of a phosphate rock up to the standard required and the market value of the inferior quality shipped. In other words, the defendants are entitled, as a measure of damages, to the difference between the market value of the rock which they should have had and the market value of the inferior rock which they actually received. It is your duty, therefore, to find from the evidence what the market value of that rock was in the port at Venice. It is the market value at the port of Venice, and not the market value here; that is, the market value of the rock that should have been shipped according to the contract. And after you have found from the evidence what the market value of the rock was at the port of Venice for which defendants contracted, then you will turn to the evidence to ascertain what the market value of the rock of inferior quality actually shipped was at the port of Venice at this time. There is evidence here to show, and it does not seem to be contradicted, that the market value of a phosphate rock of a kind that was specified in the contract at the port of Venice at that time was six pence per unit of phosphate in the rock. So that I take it, if you believe the evidence on both sides, you will have very little difficulty in arriving at what the market value of the rock would have been if it had been shipped according to the contract; and, after you have ascertained that, you will turn to the evidence and find what the value of the inferior rock actually shipped was at the port of Venice. You will not find it so easy, from the evidence, to ascertain just exactly what that market value was, because there is a wide difference and a variance of evidence here from which you are to arrive at a conclusion. There is evidence here that rock containing impurities of over 4 units was worth absolutely nothing—that it had no market value—at Venice at this time. There is other evidence here that, as a matter of fact, this rock was sold by the defendants for eight pence per unit in the market at Venice at this time. The defendants say: 'That is true; but the reason why it was sold at eight pence per unit of phosphate was because we had to give up some other valuable thing, some other valuable claim we had against Marinoni, who paid that amount to us; and, as a matter of fact, that was not the measure of the market value of that inferior rock, because, while he was apparently paying us eight pence per unit, he was getting from us a very valuable concession, which really was worth to us $5,747, a claim we had against him; and that was the reason why

he agreed to pay us eight pence per unit for this inferior article that we claim was actually worth nothing in the market.' It is a fact that, if these defendants had sold this inferior rock to Marinoni under a guaranty of its quality for eight pence per unit, and Marinoni accepted it under his guaranty, and they never discovered that it was inferior, and in ignorance, it was sold for eight pence per unit, and Marinoni settled at eight pence per unit on this guaranty, that would be no evidence at all of its market value. Because it was sold on a guaranty, there woud be an ignorance as to its inferiority; and, even if its inferiority had been discovered later, Marinoni would have a suit against the defendants for any damages he had sustained by reason of its inferiority. So that, where an article has been sold under a guaranty, or in ignorance of the inferior quality, the price that it brings is no criterion whatever of its market value; but that is not this case. While this was sold under a guaranty, yet its inferiority was discovered before settlement and before suit in this case, and therefore the fact that it was sold at eight pence per unit, and Marinoni accepted it at eight pence per unit, is not conclusive evidence as to its market value, but it is evidence as to what the market value of that inferior article was at the port of Venice when it was disposed of by the defendants; and you can give as much weight to that as you think it deserves, together with the other evidence, to ascertain just exactly what that inferior rock was worth at the port of Venice at the time it was disposed of by the defendants. So that you see all this evidence about the price that it was sold for and the compromise agreement that the defendants allege they had to enter into to induce Marinoni to accept it at that price, the fact that they had to give up a claim against Marinoni, which they say was of value to them to the extent of $5,747, is to be taken into consideration by you in arriving at just what the market value of that rock was. The fact that the defendants got eight pence per unit, under all the circumstances in this case, does not establish that this inferior rock was worth eight pence per unit, or that it was worth six pence per unit, or that it was worth any other pence per unit; but it is some evidence as to what it was worth. You may take that into consideration with what he gave up, if you believe he gave up anything valuable, in order to induce Marinoni to purchase it at that price, and from all the evidence in the cause as to the value of the inferior rock you will arrive at what you think was a fair market value per unit of that inferior article at the port of Venice at the time it was sold; and if you conclude that the inferior article was worth less, you will make a calculation as to how much less it was worth; and if you find that it was worth a sum less in amount, greater than the amount claimed here by the plaintiffs against the defendants, you will ascertain what that difference is, and you will allow the defendants a certificate for that amount. If you find that the inferior article was worth less than the article required to be furnished under contract, but that the amount is not so much as the plaintiffs claim against the defendants, you will ascertain the difference, and you will then award the difference in favor of the plaintiffs."

The jury was further instructed, by points submitted by the defendants, substantially to the effect (1) that the contract contained an express warranty of the quality of the phosphate to be delivered; (2) the plaintiffs were entitled to recover only the market value of the phosphate of the kind and quality actually delivered; (3) the market value of the kind and quality actually delivered may be ascertained in the port at Venice; (4, 5, 6) if the phosphate furnished by plaintiffs did not sustain the warranty, defendants were not required to tender return of the phosphate, but could use it at Venice, and were entitled in good faith to dispose of it to the best advantage, in such a way as to minimize damages in the port to which it had been shipped; (7, 8) if the jury find the phosphate delivered by the plaintiffs as the cargo of the steamship Euterpe was deficient in quality, the defendants are entitled to set off against the plaintiffs the damage actually sustained by reason

of the breach of warranty, and the legal measure of defendants' damages in such case is the difference in the market value of phosphate of the quality which should have been delivered under the contract and the market value of the phosphate of deficient quality which was actually delivered.

The plaintiffs' claim, with interest to the time of trial, was $5,865.89, and the jury rendered a verdict of $4,154.53. It is therefore plain that the amount of damage allowed the defendants for deficient quality of the phosphate actually delivered was $1,711.16. We are unable to say that this was against the law, the evidence, or the charge of the court. Upon a thorough re-examination of the evidence in the case, I find the evidence uncontradicted to the further facts, not so clearly stated in the charge, that the claim of the plaintiffs, with interest to date of trial, is correctly stated to be the amount above mentioned. This claim is made up of a balance due upon two shipments to Marinoni, as above stated, together with interest to the time of trial.

The shipment on which the defendants claim they have been damaged is that made September 30, 1902, on the steamship Euterpe, carrying 2,725.66 tons of phosphate rock, which damage on this cargo, it is claimed, amounts to $12,556.08. This is a sum in excess of the total amount claimed by the plaintiffs. This amount of damage is made up by the defendants assuming the value of the Euterpe's cargo at the time it arrived at the port of Venice to be the value fixed by the uncontradicted evidence, to wit, the sum of 6 pence per unit on 75½ units, instead of 78 units, of phosphate rock, from which is deducted the assumed market value of the inferior quality delivered at one-half, or 3 pence, per unit on 75½ units of phosphate rock to the ton. In other words, the defendants claim the inferior quality delivered was only worth about one-half of the market value of the guarantied quality at the time of its arrival in Venice, and that the market value of the guarantied quality was 6 pence per unit.

The plaintiffs offered no evidence to contradict the claim of the defendants that the guarantied quality of phosphate rock at that time in Venice was 6 pence per unit, but they contended that the defendants suffered no damage as a result of the alleged inferior quality of phosphate rock shipped, other than, instead of being paid on 78 units, they were paid on 75½ units, claiming that the difference in market value between the phosphate shipped and that guarantied was represented by this difference in calculation of the units; in other words, that the total damage sustained by the defendants was represented between the market value per pence on 78 units on the guarantied quality of rock and the market value per pence on 75½ units on the inferior quality shipped. And as evidence of this claim the plaintiffs refer to the testimony of the defendants showing the rock actually shipped was settled for at the original contract price of 8 pence per unit on 75½ units to the ton. The defendants reply that it was true they had sold the rock at 8 pence per unit, but this price was forced upon Marinoni by the defendants because of certain large claims which the defendants had against Marinoni, and the latter agreed to pay the original contract price, to wit, 8 pence per unit, in consideration of the defendants releasing him from these other claims.

The defendants testified to a number of claims they had against Marinoni, all of which they say were canceled for the purpose of inducing the latter to purchase at the price named. There was a written agreement between Marinoni and the defendants, showing that such a settlement had taken place. It was dated at Venice February 3, 1903; but this writing shows that no other claims entered into the settlement, excepting the unliquidated damages resulting from the shipment of phosphate on the steamship Euterpe and another cargo shipped in the steamship Aristea; and it is further shown by this agreement that both cargoes were settled for by the defendants with Marinoni upon a basis of 75½ units, at a price for which they had before stipulated on a contract of sale. · No other claims of defendants were referred to in the writing; but it is very evident that the jury concluded the difference between the market value of the guarantied article and the inferior article actually shipped was not so great as the defendants claim. The evidence would fairly support the finding that the difference was more nearly represented by the difference in units, for which the defendants were paid. The jury, under the evidence, were warranted in finding that the rock of the quality guarantied would have been worth 6 pence per unit on 78 units per ton, and that the rock actually shipped was worth 6 pence on 75½ units per ton, allowing the difference to the defendants as damages sustained by reason of the inferior quality. The amount allowed, however, was somewhat more than a calculation of this kind would show; but it was a question with the jury, and their verdict, I think, was sustained by the evidence.

The evidence introduced as to the price at which the inferior rock was sold was admissible as bearing on the market value at that time in Venice. The vendee's measure of damages is not at all dependent upon a resale by him or upon the price obtained at a resale; but where, as in this case, it was finally resold without a warranty of quality and with full knowledge of both parties of the inferiority of the article, the price obtained, while not conclusive, is some evidence of the actual value. Union Selling Co. v. Jones, 128 Fed. 672, 63 C. C. A. 224. The rule of damages was properly stated in defendant's point, which was affirmed, and in the charge of the court. Union Selling Co. v. Jones, supra; Schreiber v. Andrews, 101 Fed. 763, 41 C. C. A. 663; Am. & Eng. Ency. of Law, vol. 30, pp. 209, 210.

Motion and reasons for a new trial are overruled.